**Karen H. FOLLETT, Appellant–Plaintiff,**

v.

**Edward L. DAVIS, M.D., and Associated Physicians and Surgeons Clinic, Appellees–Defendants.**

No. 84A01–9402–CV–40.

Court of Appeals of Indiana,
First District.

July 6, 1994.

Rehearing Denied Aug. 30, 1994.

Deborah K. Pennington, Price & Barker, Indianapolis, for appellant.

John Christopher Wall, Wilkinson, Goeller, Modesitt, Wilkinson & Drummy, Terre Haute, for appellees.

ROBERTSON, Judge.

Karen H. Follett appeals from the grant of summary judgment in favor of Edward L. Davis, M.D., and Associated Physicians and Surgeons Clinic. Dr. Davis and the Clinic had sought a preliminary determination of law and summary judgment. The trial court

granted summary judgment on the ground that Follett did not file her complaint within the applicable statute of limitations. Follett contends that her claim is not barred by the statute of limitations because the complained of conduct was a continuing wrong, some of which accrued within the statute of limitations. We reverse.

■ When we review the propriety of the entry of summary judgment, we apply the same standard as does the trial court. *Havens v. Ritchey* (1991), Ind., 582 N.E.2d 792. We view the designated evidentiary matter in the light most favorable to the nonmovant. *See id.*; Ind.Trial Rule 56(C). Summary judgment is appropriate only when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Id.*

The evidence most favorable to Follett shows she became a patient of the Clinic in 1978, at the latest. She had her first office visit with Dr. Davis in 1987. Dr. Davis is a board certified obstetrician and gynecologist and is a shareholder of the Clinic. In the spring of 1988, Follett discovered a lump in the upper, outer quadrant of her right breast and made an appointment to see Dr. Davis about it. When she arrived at the Clinic on April 1, 1988, Clinic employees told her that Dr. Davis was not available. The Clinic had no record of her appointment. Follett maintained that she indeed had an appointment and explained her need for a breast exam and a mammogram because she had found a lump in her breast. Clinic employees again told her that Dr. Davis was unavailable and directed her to radiology for a mammogram. The Clinic employees did not offer Follett a physician's examination from Dr. Davis or any other doctor at the Clinic and did not schedule a physician's examination as a follow-up to the mammogram.

At the radiology department of the Clinic, Follett completed a history form which indicated she was there to have a breast lump evaluated. According to this record, the lump had been present "1 month." A technician examined Follett's breast and confirmed the presence of a lump in the upper, outer quadrant of her right breast. After the mammogram, Clinic employees told her that she would hear from Dr. Davis if there was any problem with her mammogram and that she could assume everything was normal if she did not hear from him.

A radiologist interpreted the mammogram and rendered a report. The mammogram report sent to Dr. Davis relates the radiologist's findings:

> Very dense dysplastic breasts are seen. There is marked fibrous dysplasia with fibroud [sic] predominance. A benign apeparing [sic] calcification is seen in the superior left breast but no tumoral calcification is evdient[sic]. There is no definite evidence of a dominant spiculated mass, skin thickening or retraction, nipple inversion or focal heightened vascularity.
>
> IMPRESSION: The breasts are very dense and a noncalcified new growth could not be excluded. Nothing int his [sic] report should disuade [sic] biopsy of a clinically suspicious lesion. No tumoral calcifications are seen but in view of the dense nature of the breasts, serial studies would be useful.

The radiologist explained in his deposition that the mammogram was "not normal." He stated that he could not see a specific lump or nodule that would be diagnostic for cancer but that "[t]he density of the breasts [were] such that [he] was concerned that unless a tumor was calcified, that it could be very easily missed in this kind of breast ..." The "serial studies" mentioned in the mammogram report refers to the patient's return at designated intervals for repeat examination if the referring physician does not order a biopsy. In the radiologist's opinion, "it is virtually certain that had [a mammogram] been done serially, the calcifications would have become apparent before September of 1990."

Dr. Davis received and reviewed the mammogram report and considered it to be "negative for malignancy." He did not know of the new breast lump, however, because none of the Clinic employees had informed him about it. Had he known of the breast lump, he would have had Follett come in for an examination. His standard practice, however, was to perform a physical examination along with a mammogram. Further, Clinic

employees acted contrary to practice and expectations by offering Follett a mammogram without scheduling a physical examination.

The Clinic, including Dr. Davis, never contacted Follett about her lump or the mammogram. Follett called the Clinic, however, on April 6, 1990; and Clinic employees told her that there was nothing to worry about unless she heard from Dr. Davis. Follett nevertheless returned to the Clinic and Dr. Davis on September 24, 1990, after she had developed pain associated with that same lump. A mammogram performed on that day gave results consistent with cancer. Dr. Davis made an appointment for Follett with a Clinic surgeon for a biopsy and treatment. Follett kept her appointment with the surgeon on September 27, 1990; and this was her last visit with the Clinic, as she subsequently transferred her care to Indianapolis physicians. The biopsy confirmed the diagnosis of cancer in October of 1990. Follett filed her proposed complaint with the Department of Insurance on August 20, 1992.

▮ Follett claims the wrong she suffered was a continuing wrong. The doctrine of continuing wrong is simply a legal concept used to define when an act, omission, or neglect took place. *Havens*, 582 N.E.2d at 795. The statutory period of limitations begins to run at the end of the continuing wrongful act. *See id.*

▮ The evidence most favorable to Follett shows that, after she had found a lump in her breast, she went to Dr. Davis, her regular obstetrician and gynecologist, and the Clinic for aid. Dr. Davis and the Clinic, through the Clinic's employees and agents, undertook to treat her ailment. That undertaking ended only when the Clinic's surgeon performed the biopsy and therefore was continuous in nature. The same operative circumstances appeared in *Ferrell v. Geisler* (1987), Ind.App., 505 N.E.2d 137 (failure to diagnose breast cancer until the malignancy was far advanced). In that case, we stated:

It is our opinion that a physician's responsibility to a regular patient, who continued under his care for a specified ailment, is not limited, as a matter of law, to the periods of time the patient is in his presence. It is a factual matter.

*Id.* at 140. So it is here.

Dr. Davis and the clinic acknowledge the *Ferrell* decision but claim the doctrine of continuing wrong "was improperly applied" there, the last opportunity to make an erroneous diagnosis having occurred at the second to last visit to the doctor's office. There, however, the doctor had undertaken the process of determining whether the lumps in the patient's breasts were malignant and the doctor-patient relationship continued until the last office visit when he made a diagnosis. The same is true in the present case. Dr. Davis and the Clinic should not benefit from the fact that they did not act for a period of nearly two and one-half years when it is their continuous omission to act, in the face of their undertaking to do so, which is the basis of Follett's complaint.

▮ When the sole claim of medical malpractice is a failure to diagnose, the omission cannot as a matter of law extend beyond the time the physician rendered a diagnosis. *Havens*, 582 N.E.2d at 792. Follett last visited Dr. Davis on September 24, 1990, and last visited the Clinic on September 27, 1990. The evidence most favorable to Follett demonstrates that, had Clinic procedures been followed, Davis or another doctor at the Clinic would have had occasion to diagnose her problem before either of those dates. On August 20, 1992, Follett timely filed her proposed complaint within two years the last visits to Dr. Davis and the Clinic. *See* Ind. Code 16-9.5-3-1 (see now I.C. 27-12-7-1). The trial court therefore improperly granted them summary judgment.

Judgment reversed.

SHARPNACK, C.J., and BAKER, J., concur.